# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JEBRELLE WRIGHT,

                        : 

          Petitioner,                        Case No. 1:11-cv-105

                       :          District Judge Michael R. Barrett

    -vs-                            Magistrate Judge Michael R. Merz

WARDEN, Warren Correctional
  Institution,

                       : 

          Respondent.

---

## REPORT AND RECOMMENDATIONS

---

Petitioner Jebrelle Wright is serving a sentence of twenty-three years to life on his convictions by a jury for murder, felonious assault, and kidnapping in the Hamilton County Common Pleas Court. He pleads the following Grounds for Relief:

> **Ground One:** Petitioner was denied a fair trial when Evidence Rule 901, concerning Authentication, must require that the proponent have personal or firsthand knowledge that a writing was made by a particular individual before a trial court may permit it into evidence.

> **Ground Two:** Petitioner was denied a fair trial when the trial court violated the hearsay exception, codified in Evid.R.801(D)(2)(e), allows the introduction of statements by a "co-conspirator" made during the course of and in furtherance of the conspiracy. This exception should require that the State make a substantial showing of the existence of the conspiracy through independent means verses [sic] a "prima facie" showing.

> **Ground Three:** Petitioner was deprived of his rights under the Fifth Amendment from Double Jeopardy as applicable to the states through the Due Process Clause of the Fourteenth Amendment when the trial court failed to apply Allied Offenses of Similar Import to Murder and

Felonious Assault.

(Petition, Doc. No. 3, PageID 49-52.)  On Judge Litkovitz's Order, the Warden has filed a Return of Writ (Doc. No. 8).  Although granted time to do so, Petitioner had not filed a reply and the time for doing so has expired.

The background facts of this case taken from the First District Court of Appeals opinion are as follows:

> [¶5] [Kierra] Anderson testified that on the evening of July 11, 2007, she went to Findlay Park, located in the Over-the-Rhine area of Cincinnati, with her toddler, Jakayla, and a friend. At the time, Anderson was pregnant, and both she and Price believed-incorrectly--that Price was the father of the unborn child. Weeks before, in June, at Price's Aunt Eileen's house on McMicken Avenue near Findlay Park, Price had demanded that Anderson abort the pregnancy, but she had refused. The refusal prompted a beating by Price, which centered on Anderson's stomach and included his threat "to kill" the unborn baby. After this June assault, Anderson was treated at Good Samaritan Hospital by Dr. Patrick Dawson, who observed bruises on both sides of Anderson's abdomen and determined that the baby she was carrying was healthy. Dawson told Anderson to stay away from the father of the unborn child, whom Anderson had blamed for her injuries. Anderson claimed that she had tried to avoid Price after the June assault.
>
> [¶6] While at Findlay Park on July 11, Anderson saw Price. He was uncharacteristically nice to her and even rubbed her belly. Anderson testified that Price had convinced her to go to a nearby apartment with him, and that she had brought her child, her stroller, and food that she had earlier purchased from an Arby's restaurant. When they arrived outside the apartment building at 1818 Race Street, they stayed there talking for a short time. Then they climbed the stairs to apartment 317 and entered, leaving the stroller in the hallway. Almost immediately upon entering the main room of the apartment, Anderson was struck in the face by Wright, whom Anderson had never met. When she called out to Price for help, he picked up Jakalya and gave her to a man named James Hurt who was standing in the hallway outside the apartment. Price then came back into the apartment, shut the door, and joined Wright in kicking and punching Anderson. When Anderson fell to the ground, Wright and Price repeatedly

stomped on her stomach. While this was going on, Wright kept calling Anderson "bitches," and Price said that she should have had an abortion and that he was going "to kill" the unborn child. The beating was so brutal that Anderson defecated on herself.

[¶7] Anderson claimed that she was able to escape when Chris Barnes, the resident of the apartment who had been in a back room, entered the front room, yelled for Wright and Barnes to stop, and was then attacked by Wright. Anderson left the apartment, grabbed Jakayla from Hurt, and started down the steps with Price in pursuit, leaving her stroller, purse, and other belongings behind. As she started down the steps, Price pushed her and she fell down the steps. Price then started kicking Anderson again in the stomach while she held Jakayla, saying that she should have had an abortion.

[¶8] Anderson eventually made it out to Race Street, where she boarded a bus that was stopped on the street. The driver dropped her off at the Hamilton County Justice Center, where Anderson ran into the women's restroom and called 911.

[¶9] Anderson, who was not wearing a watch that evening, was not able to provide the specific time of each event. And she admitted at trial that she had lied to the police by initially claiming that Price and others had forced her to go with Price to the apartment where she was beaten.

[¶10] Cincinnati Police Officer Barbara Maleski testified that she had received a dispatch around midnight on July 11, 2007, to respond to the Justice Center. When she arrived, she saw the visibly pregnant Anderson outside the women's restroom on her knees, crying and distraught.  Anderson complained of severe pain, was unable to move, and screamed when she was touched. Feces were on her clothes and her legs. Her top was torn, she was shoeless, and many of her hair extensions were missing.

[¶11] Anderson was transported with Officer Maleski to University Hospital by ambulance. En route, she told Maleski that she had been assaulted by three black males and that she knew only one of them. She identified the person she knew as Lonzo Pitts, who the police later determined was Alphonso Price. Anderson said that Price was the unwilling father of her unborn baby and had dragged her inside a green building on Race Street where he had expressed his unwillingness to be a father and beaten her with another individual. Anderson clarified at this time that the third individual (Hurt) had not

participated in the beating.

[¶12] Upon arriving at the hospital, Officer Maleski observed severe, deep purple bruising on Anderson's arms, thighs, back and abdomen, including bruising in the shape of a shoe or boot print on Anderson's thighs. Anderson received prompt treatment from Dr. Michelle Rosario.  The doctor testified that she too had observed significant bruising and swelling on Anderson's abdomen, lower back, and thighs, and that some bruising was shaped as foot or boot prints.

[¶13] Dr. Rosario performed an ultrasound that showed that Anderson was seven months' pregnant, but that the viable baby girl that Anderson had been carrying was deceased. Labor was induced, and Anderson delivered a stillborn baby she named Precious Anderson. Dr. Rosario testified that she did not notice any abnormalities in the baby, except that her skull felt like it had been fractured. The coroner, Dr. Obinna Ugwu, confirmed that the viable unborn baby had suffered a skull fracture. He opined, in a videotaped deposition that was played at trial, that Precious had died as a result of severe head injuries sustained from blunt impact to the head that had been inflicted while Precious was in the womb, a short time before her death. He also found that the placenta had been injured.

[¶14] Cincinnati Police Homicide Detective Kurt Ballman investigated the attack and testified at trial. He and his partner, Detective Jeff Schare, had visited Anderson in the hospital shortly after her arrival. At that time, Anderson, who was "distraught" and concerned about the baby she was carrying, described what had happened to her in a green apartment building near Findlay Park. She provided the detectives with the names of "L'il Al," whom she also knew as Alfred Pitts, and "Jamie," later identified as James Hurt. She informed them that she did not know the third man involved, but that she would be able to identify him.

[¶15] Detective Ballman described Anderson as "beaten up pretty bad," with visible injuries and swelling on her arm, abdomen, shoulder, and face. Criminalist Barbara Mirlenbrink photographed the injuries, and the photographs were admitted into evidence at trial.

[¶16] The police determined that "L'il Al" was Alfonso Price, and Anderson identified him as one of her attackers after she was shown his photograph. The police also located the green apartment building where the attack had occurred. Detective Ballman testified that the building had a long, steep stairwell. When he got to the top of the

stairs, he saw Anderson's stroller. Near the stroller was the door for apartment 317. The apartment belonged to Chris Barnes, who gave the police permission to search it. At trial, Ballman described the inside of the apartment as in shambles, with Anderson's purse and shoes near the door and hair weave and fecal matter scattered on the floor. Ballman also recovered inside the apartment a broken denim belt for Anderson's clothing, Anderson's broken jewelry, an Arby's bag, and blood stains.

[¶17] In the days following the beating, the police began a search for Price. On July 17, 2007, James Hurt came forward and provided the police with the names "Jebrian," "Jebron," and "L'il Bro" for the other individual they were seeking.

[¶18] About two weeks later, a special police tactical unit located and arrested Price at the Four Towers Apartments. Detective Ballman was contacted and informed that Price was in custody. Ballman asked if Price was with anyone with the first name Jebrell. Ballman was told that Price was in an apartment with a Jebrell Wright. Wright was then arrested.

[¶19] After Wright's arrest, police placed a photograph of him in a six photograph lineup that was shown to Anderson and Hurt. Both Anderson and Hurt identified Wright as an attacker first to the police and again at trial.

[¶20] Chris Barnes, who resided in the apartment where the attack had taken place, also identified Wright as Anderson's attacker at trial. Barnes added that Wright had arrived first at his apartment that night, and that he had told Barnes that Price would be arriving "shortly."

[¶21] The defense presented four witnesses. Keyona Thomas, Wright's sister, testified that she was with Wright all day and evening on July 11, 2007. According to Thomas, they had spent the day at their mother's apartment on East 12th Street in Over-the-Rhine, where they both lived, and they had gone to a playground with her daughter from 5:00 p.m. until 8:30 p.m. They returned home together, and she went to sleep at 11:00 p.m., believing that Wright was in his bedroom.

[¶22] Sandra Smith testified that she had seen Anderson in Findlay Park on the evening of July 11, 2007, and that Anderson had told her that she was going to get an abortion. Price was with Anderson in the park, rubbing her belly.

[¶23] The two other defense witnesses, Ronkita Price and Johnrella Jackson, testified that on July 11, 2007, they had observed Anderson looking for Price at his Aunt Eileen's house several times.

[¶24] In rebuttal, the state presented over objection the testimony of Deputy John Kampaus and Deputy Kenneth Pendleton. Kampaus testified that he had been assigned to guard Wright and Price in the courthouse holding facility when court was in recess during the trial. On a lunch recess taken after jury voir dire, he had discovered a handwritten note in the paper-towel dispenser of the holding facility's restroom immediately after Price had exited from the restroom. The note contained many details paralleling the facts in the case and suggested a version of events about which one could testify that would exonerate the pair. The note was admitted into evidence over objection. Deputy Pendleton authenticated the videotaped surveillance of the restroom area taken around the time the note was recovered and a collection of still photographs that he had printed from the videotape.

*State v. Wright,* No. C-080437, 2009 Ohio 5474, 2009 Ohio App. LEXIS 4635 (Ohio App. 1st Dist. Oct. 16, 2009).

In the Return of Writ, the Warden concedes the Petition is timely filed and does not raise any lack of exhaustion of procedural default defense. Thus this Court proceeds to a consideration of the merits.

### Grounds One and Two

In his First Ground for Relief, Wright asserts that the note found in the prisoners' restroom immediately after his co-defendant Price was there was not properly authenticated under Fed. R. Evid. 901 and that its admission violated the hearsay rule because the State had not adequately proved the co-conspirator exception to hearsay.

The Federal Rules of Evidence govern only trials in the federal courts; they do not apply to

trials in state courts. The question of whether the note was properly admitted in evidence was considered by both the trial court and the First District Court of Appeals as an Ohio evidentiary law question. This Court cannot reconsider whether those courts were correct or not on a question of Ohio evidence law.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. §2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*;Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips,* 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983); *Bell v. Arn,* 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007); *Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000). Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly. *Bugh, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United States*, 493 U.S. 342, 352 (1990). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our

people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  The Supreme Court has defined very narrowly the category of infractions that violate fundamental fairness. *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007), *citing Dowling v. United States*, 493 U.S. 342, 352 (1990)(Identification from a trial which resulted in an acquittal could be introduced at second trial for similarities.)

Grounds One and Two are not cognizable in federal habeas corpus and should be dismissed with prejudice.

## Ground Three: Double Jeopardy

Wright was convicted of murdering Anderson's unborn child and of felonious assault on Anderson.  He argued in the state courts that these were allied offenses of similar import and that he had been sentenced on both in violation of Ohio Revised Code § 2941.25.  In this Court he argues that the dual convictions violate the Double Jeopardy Clause as follows:

> In this case, Mr. Wright was convicted of committing Murder, as a result of the unlawful termination of Ms. Anderson's pregnancy, and Felonious Assault for causing serious physical harm to Ms. Anderson. In this case, the only evidence of serious physical harm to Ms. Anderson was as the result of the unlawful termination of her pregnancy. Any other injuries she sustained did not meet the definition of serious physical harm. This was even argued by the State. There was one act, one victim and no separate animus for each of these offenses. Therefore, according to this Court's ruling in *Cabrales* and lower Court's subsequent interpretations of this ruling, Mr. Wright state [sic] that he should have been sentenced only on the murder count for a total sentence of fifteen years to life.

(Petition, Doc. No. 3, PageID 53.)

For the same reasons given with respect to Grounds One and Two, this Court cannot

-8-

reexamine the correctness of the state courts' interpretation of Ohio Revised Code § 2941.25 because that is a question of state law. However, unlike Grounds One and Two, multiple convictions do implicate the federal constitution, to wit, the Double Jeopardy Clause which affords a defendant three basic protections:

> It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.

*Brown v. Ohio*, 432 U.S. 161, 165(1977), *quoting North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). The Double Jeopardy Clause of the Fifth Amendment was held to be applicable to the States through the Fourteenth Amendment in *Benton v. Maryland*, 395 U.S. 784 (1969).

The test for whether two offenses constitute the same offense is "whether each offense contains an element not contained in the other." *United States v. Dixon*, 509 U.S. 688 (1993); *Blockburger v. United States*, 284 U.S. 299 (1932). Where two offenses are the same for *Blockburger* purposes, multiple punishments can be imposed if the legislature clearly intended to do so. *Albernaz v. United States*, 450 U.S. 333, 344 (1981); *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); and *Garrett v. United States*, 471 U.S. 773, 779 (1985).

In this case, the Hamilton County Court of Appeals interpreted Ohio law as permitting multiple sentences here when there were two victims, Kierra Anderson and her viable but unborn baby. Petitioner's argument is that all the injuries inflicted on Kierra Anderson were merely incidental to the injuries inflicted on the baby and were not, in any event, serious enough to qualify as "serious physical harm" under the Ohio felonious assault statute. The court of appeals dealt with both of these arguments as follows:

[*P34] "Serious physical harm" is defined in R.C. 2901.01(A)(5) as "(a) [a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) [a]ny physical harm that carries a substantial risk of death; (c) [a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; (e) [a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." The gravity and duration of the harm separates "serious physical harm" from "physical harm." R.C. 2901.01(A)(3).

* * *

[*P36] We decline to follow *Winston* because the jury instruction approved in that case predates current law, which recognizes the fetus as a separate crime victim in certain circumstances. [Footnote omitted.] That said, the state's evidence sufficiently supported a finding that Anderson's injuries rendered her temporarily and substantially incapacitated as contemplated by R.C. 2901.01(A)(5)(c), and thus, the state showed "serious physical harm." Anderson's body absorbed the same intense blow that cracked the fetus's skull. The trauma inflicted by Wright was so severe that it bruised Anderson's back and abdomen, injured her placenta, and caused vaginal bleeding. Officer Maleski testified that when she had located Anderson outside the women's restroom at the Justice Center, Anderson was unable to move on her own. Anderson was hospitalized for several days after sustaining this trauma and giving birth to a stillborn female. We conclude that this evidence supported a finding that Anderson's physical harm involved a temporary, substantial incapacity and rose to the level of serious physical harm as defined in R.C. 2901.01(A)(5)(c).

[*P37] Additionally, we hold that the evidence supported a finding that Anderson's physical harm involved "acute pain of such duration as to result in substantial suffering" and rose to the level of "serious physical harm" as defined in R.C. 2901.01(A)(5)(e).

[*P38] Anderson described receiving a beating so severe that she defecated on herself. She estimated that she was struck 20 times by fist or foot and pushed down a flight of stairs. She described having pain "everywhere"--"in my stomach and back, on my face, on my

-10-

arms, on my legs." When Officer Maleski located Anderson outside the women's restroom at the Justice Center, Anderson complained of severe pain and screamed in pain when she was touched. Anderson was transported to University Hospital, where she was admitted for several days and treated by Dr. Rosario. In addition to finding Anderson's fetus deceased, Dr. Rosario found "significant bruising and swelling" on Anderson's "upper extremities," "abdomen," "lower back," and "thighs." The coroner found trauma to the placenta. The detectives who met with Anderson in the hospital testified that they had also observed bruising and swelling all over her body. Officer Maleski, who had photographed Anderson's injuries, identified at trial the photographs showing red marks on Anderson's dark skin.

[*P39] The evidence presented at trial with respect to the gravity and duration of Anderson's injuries was sufficient to prove that she had suffered "serious physical harm" within the meaning of both R.C. 2901.01(A)(5)(c) and (e), and that Wright had inflicted it. Thus, we reject Wright's argument that his felonious-assault conviction was not supported by sufficient evidence.

*State v. Wright*, No. C-080437, 2009 Ohio 5474, 2009 Ohio App. LEXIS 4635 (Oct. 16, 2009).

Here the court of appeals determined that Ohio law permitted multiple punishments for harm inflicted on separate victims in one course of conduct:

[*P62] In his fifth and final assignment of error, Wright argues that the trial court erred by separately sentencing him for allied offenses of similar import. Although the state proceeded against Wright for offenses arising from a single course of conduct, each offense involved a separate victim--the felonious assault of Anderson and the murder of her unborn child. Thus, the offenses were of dissimilar import and separate sentences were permitted. *See State v. Jones* (1985), 18 Ohio St.3d 116, 18 Ohio B. 148, 480 N.E.2d 408. Because Wright's allied-offenses argument is meritless, we overrule his fifth assignment of error.

*State v. Wright, supra*. That holding is conclusive for double jeopardy purposes. Petitioner's Third Ground for Relief is thus without merit and should be dismissed.

-11-

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied any requested certificate of appealability and that the Court certify any appeal would not be taken in objective good faith.

February 27, 2012.

s/ **Michael R. Merz**
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

J:\Documents\Wright Habeas.wpd